STATE OF OHIO ex rel. SQUIRE, Superintendent of Banks of Ohio, v. METROPOLITAN LIFE INS. CO. et al.

No. 4102 Civil.

District Court, N. D. Ohio, W. D.

Dec. 18, 1940.

George R. Effler, of Toledo, Ohio, for plaintiff.

Claude R. Banker and E. Donald De-Muth, both of Toledo, Ohio, for defendants.

KLOEB, District Judge.

The plaintiff in this case is the liquidator of the Ohio Savings Bank & Trust Company which, prior to August 17, 1931, was a bank doing business in the city of Toledo, Ohio, by virtue of a charter issued to it by the State of Ohio. It closed its doors on August 17, 1931.

The defendant, Metropolitan Life Insurance Company, on the 24th day of August, 1920, entered into a written contract with plaintiff's bank wherein the bank, in contemplation of a sale of certain mortgages upon real properties in the State of Ohio to the defendant, was authorized and empowered to service the said mortgage loans by way of collecting the principal and interest installments, seeing that the taxes and insurance premiums were paid, that abstracts of title were correctly brought down to date and doing such other matters and things as were set forth in this written agreement. Stip. 1, Par. 6.

It appears that in the following years, 1926 and 1929, the Bank sold to the defendant additional numbers of mortgage loans, so that these mortgages so sold and assigned by the Bank to the defendant amounted to a large sum, approximately $10,000,000. The sale of mortgages made in the year 1926 brought upon the parties to the transaction some additional problems encountered in the servicing of these large numbers of additional loans. These problems necessitated an amendment to the agreement of August 24, 1920, and thereupon the officers representing the Bank and Metropolitan, instead of proceeding in the accustomed way by writing a new agreement or a formal amendment to the agreement of 1920, chose to invite a lawsuit by agreeing between themselves that certain exchanges of letters should constitute the amendments to the original contract. The Court is now involved in untangling the problems that were created through this course of procedure.

The defendant, the Ohio Savings Bank & Trust Company, filed its answer to the petition in which it admitted the allegations of the petition to be true. The differences sought to be settled through this suit arise between the plaintiff and the defendant, Metropolitan Life Insurance Company.

The case was tried to the Court upon waiver of jury.

The parties to this suit entered into Stipulation No. 1, which sets forth the original agreement and, in chronological order, the various exchanges of letters that passed between the parties, and it contains in addition thereto certain other points agreed upon by opposing counsel. There was also executed Stipulation No. 2, which consists of Exhibits 1 to 70, both inclusive. Both of these stipulations are of great importance to a complete understanding of the transactions that occurred between the contending parties.

The preamble to the original agreement of August 24, 1920, is as follows:

"Memorandum of Agreement, made this 24th day of August, 1920, by and between, The Ohio Savings Bank & Trust Company, of Toledo, Ohio, Party of the First Part,

and The Metropolitan Life Insurance Company, of the City of New York, New York, Party of the Second Part, Witnesseth:

"Whereas, The Party of the First Part is hereafter to sell and assign to the Party of the Second Part, certain mortgages upon certain real properties, in the State of Ohio, securing loans made to the owners of the respective properties, and

"Whereas, The Party of the First Part desires to keep in touch with the respective mortgagors under such mortgages and to render to the Party of the Second Part all possible assistance in connection with the ownership by the Party of the Second Part of such mortgages.

"Now Therefore, In consideration of the sum of One ($1.00) Dollar to each of the Parties hereto in hand paid by the other, the receipt whereof is hereby acknowledged, and in consideration of the mutual promises hereinafter set forth, the parties hereto do agree with each other as follows:"

The agreement then proceeds to bind the Bank to make collection of interest and principal installments and forward them to the defendant; to see that buildings are adequately insured and to act as custodian of the policies; to see that the taxes and assessments upon the real property are duly paid and to notify the defendant upon nonpayment; to retain in its custody abstracts of title; *to retain the privilege of repurchasing any of the mortgage loans in case of nonpayment of principal and interest or of default in any of the conditions of the mortgage, or at its option to exchange a new mortgage loan for the one so in default;* to receive as and for compensation for the foregoing a retention of all interest collected on the loans in excess of six per cent (later by letter made in excess of 5½ per cent).

It was further understood in this agreement that the instrument should not constitute any guarantee by the Bank of the payment by mortgagors of the principal and interest due under the terms and conditions of any or all of said mortgages.

After the execution of this agreement, the Bank sold to Metropolitan a number of notes secured by mortgage deeds which were endorsed by the Bank to Metropolitan without recourse.

Under date of January 21, 1926, the Bank wrote the Insurance Company that a certain discrepancy in the total sum of money owing on 74 mortgage loans was due to the fact that "in several cases, we have advanced payment from this office, in order to keep your records current where we have felt justified in so doing because of the honesty and integrity of the mortgagor and because of reasons beyond our control." Stip. 1, Par. 8.

The Bank then proceeded to suggest that some arrangement be made so that any advancements that it might make would not be *credited upon the note,* as this might be embarrassing in making a collection if the mortgagor knew that a credit had been applied upon his note. It was further suggested that the Bank, in making remittances, specify the actual amount as paid by the mortgagor and that Metropolitan credit this amount upon his note, retaining the balance in an escrow fund until such time as the mortgagor had paid the Bank, at which time the Bank would advise Metropolitan to make the proper credit upon the note.

In this communication the Bank further states the following: "As to the collections, you can readily see that we have had some difficulty although not serious, but only a question of a few weeks or a month's extension." No reply to this letter is found in the record.

On June 26, 1926, the Bank wrote Metropolitan in part as follows:

"In anticipation of the clerical work in connection with your purchase of a group of mortgages from us we are suggesting and submitting for your approval, forms in connection therewith, as follows: * * *

"Also, with reference to monthly remittances, we understand that we are to remit to your Company on the 5th day of each month all payments of principal and interest received during the preceding month."

Under date of July 1, 1926, Metropolitan wrote to the Bank in part as follows:

"It is understood and already covered by letter, that the usual supervision and handling of these loans will be substantially in accordance with the agreement which we now have with your Bank whereby you act as our mortgage loan correspondent. * * *

"As to waiving or postponing quarterly payments on account of principal. We would prefer to handle this in the same manner as regular loans which we take from you from time to time. In other

words, if a borrower desires to waive a payment, we prefer that you submit each individual case of this kind and we will endeavor, with your recommendation, to have it promptly authorized by the Committee. Of course we understand such requests will only be submitted by you where merited. We would prefer not to postpone reduction payments. If occasionally you desire to allow a borrower a little time, we prefer that you advance the payment to us when due. This method will simplify matters greatly for us here."

Under date of July 14, 1926, Metropolitan addressed a letter to the Bank in which it called the Bank's attention to a serious situation growing out of the remittance by the Bank of installment payments on the fifth day of each month of all installments received during the preceding month. Metropolitan complained that if it permitted remittances in this manner, it would mean that the Bank would be holding a considerable sum of money due Metropolitan and on which Metropolitan would be receiving no investment return, and it further stated that if this course were pursued the insurance company would be subject to serious criticism by the Insurance Department of the State of New York. Metropolitan then asked advice as to how this situation might be overcome. The letter continues as follows: "Two methods for your consideration have been suggested here: One is a modification of all these loans making the interest and reduction payments become due on either the 1st or the 15th of the month. Inasmuch as these loans are virtually all past due, we are wondering if this would not be possible. The other suggestion is that you make weekly remittances to us, that is you could send your offering Friday or Saturday so that we would receive it Monday, mailing a statement *covering all remittances due and collected during that week*. Possibly you have some better method in mind, but of these two we would much prefer the former." (Italics added)

On July 29, 1926, the Bank sent a night lettergram to Metropolitan reading as follows: "In connection with your recent approval of approximately eight hundred and sixty four mortgage loans our executive committee has accepted your suggestion that we make weekly remittance of principal and interest installments as the same become due with the understanding that you will not credit such remittances on the notes except upon our written advice that the said items have actually been paid by the mortgagors."

Under date of July 30, 1926, Metropolitan acknowledged receipt of the lettergram and stated in addition in part the following: "We hereby confirm the understanding that remittances received from you are not to be endorsed on the notes except upon your written advice."

On July 31, 1926, the Bank addressed a letter to Metropolitan in which it sought to summarize the agreement with reference to the purchase of 864 mortgage loans and after stating that the terms and conditions of the transaction are in accordance with the contract of August 24, 1920, it proceeds to enumerate certain propositions, among which are the following:

"Remittances of interest and principal installments will be mailed by us on Saturday of each week, covering amounts maturing during the weekly period beginning with the preceding Saturday and ending with the preceding Friday. * * *"

"We have the privilege, in our own discretion, of granting to any mortgagor the right to either pass or extend the time for payment of any installment of principal, but the passing or extension of time for payment of any principal installment may be granted not more than two quarter annual periods without your written consent. * * *"

"If we should exercise our option right to re-purchase any loan by reason of default in payment of principal, interest, taxes, premiums on fire insurance or because of easements, encroachments, etc. then we will pay to you the principal balance of such loan, plus accrued interest thereon, at the rate of 5½ per annum. * * *"

"Remittance by us of any principal and interest installments will not be construed as evidence that the mortgagor has paid the same and such remittance of principal and interest will not be credited by you on the mortgage notes except upon written advice from us that such installments have actually been paid by the mortgagor. * * *"

This letter of summation was received by Metropolitan and on August 5, 1926, there was sent to the Bank the following reply in part: "We have your letter of the 31st ultimo, referring to the purchase by us from your company of approximately 864 loans, amounting in all to about $4,000,000. *We hereby confirm the fact that the purchase of*

*said mortgage loans is to be in accordance with the terms upon which the loans have been authorized, as contained in our previous letters to you, and in accordance with the contract between you and this Company dated August 24, 1920."* (Italics added)

After July 31, 1926, Metropolitan rendered monthly statements to the Bank (exhibit 1) and the Bank remitted to Metropolitan interest and principal payments on Saturday of each week to cover installments due during the previous seven days. Each weekly remittance was accompanied by a report from the Bank showing the interest and principal amounts included in the remittance. Exhibit 2. These reports did not indicate and Metropolitan was not advised whether or not the principal and interest so remitted by the Bank had been paid by the mortgagors.

At no time from the inception of the original contract to the closing of the Bank does the record disclose that the Bank notified Metropolitan to credit specific payments to the mortgage notes. *During this entire period Metropolitan resold and the Bank repurchased a large number of the mortgage notes.* Included in this number were notes on which the payment of interest and principal was in default, but in all these cases the repurchase price was the amount due on the notes as shown by the record cards of Metropolitan.

Exhibits 1 and 2 constitute statements from Metropolitan to the Bank of installment payments due in the succeeding month and statements of the Bank to Metropolitan showing remittances of installments due during the week preceding the date of the statement. In all of these cases the installment remittances and the principal balances coincide.

On May 12, 1931, the Bank addressed a letter to Metropolitan reading in part as follows:

"Mr. Campbell, in his phone conversation with you, discussed the matter of advances by us of mortgage installments, and in this letter, we wish to restate our problem in somewhat more detail.

"Many of our borrowers, though possessing excellent paying records have, on occasions, found it necessary to ask that their principal installments be deferred. *We have in the past, chosen not to bother you with requests for waivers,* but the accumulation of these advances over a period of five or more years, has now reached the total of something over $150,000.00." (Italics added)

Under date of May 14, 1931, Metropolitan addressed a letter to the Bank reading in part as follows:

"I acknowledge receipt of your letter of May 12th and I do not think Mr. Campbell quite understood what I said.

"He advised me, as I remember, that there were certain borrowers who were able to keep their interest and taxes up but who were unable to pay any principal installments and that the advances while not serious did not seem wise if there was any method of postponement to final maturity of such principal items, as they mature."

"It was not my understanding that the number of loans involved would be anywhere near 600 out of your total of 3,200 and I do not know what the attitude of the Comptroller may be. I asked Mr. Campbell to write me, as you have now done, giving us the facts and advised him that in individual cases upon receipt of proper information, we would see what could be done.

"Before I discuss this matter with Mr. Nortin in Mr. Fackner's absence, I am going to ask that you please send me a list of such advances not by loan numbers but by months. I mean by that that I want a list separated between the quarterly and the regular semi-annual type over the last year, giving us the total amount due at each maturity, the total amount paid, and the amount of your advances.

"Under no circumstances, would we be willing to consider the postponement of more than two principal installments at this time and I do not understand your reference to the waiver of two or more principal installments also your reference to the accumulation of these advances over five or more years. It was my understanding that you were bringing foreclosure or enforcing collection when the delinquency reached serious proportions and I would certainly feel that a delinquency of over six months was serious.

"Until such time as I have this information and the matter has been discussed with the Comptroller, we would not want to consider any groups of these postponements, though we will, of course, consider individual cases as in the past when particularly recommended."

When the Bank closed its doors on August 17, 1931, it had advanced to Metro-

politan a large sum of money considerably in excess of $150,000 and thereafter the Superintendent of Banks, acting as liquidator, made collections of many of these advancements from the mortgagors, and in connection with others he caused deposit accounts of the mortgagors to be offset by the sums theretofore advanced by the Bank to Metropolitan. The unpaid balance of claimed advancements and as disclosed by plaintiff's petition is $314,260.75, and since the date of the filing of the petition certain other collections have been made by plaintiff that would further reduce this sum to approximately $250,000.

The plaintiff asserts three propositions as the basis of his claim for recovery. First, he contends that: "The agreement under which the Bank was acting as Metropolitan's collection agent, as amended by the correspondence, expressly provided that none of the remittances made by the Bank were to be credited upon or treated as payments upon the mortgage obligations until receipt by Metropolitan of written advice from the Bank of the actual payment by the mortgagors. Therefore, the advances made by the Bank were beneficially the property of the Bank until repaid to it by the borrowers. Metropolitan, not having been instructed to credit these advances, is required to account therefor to plaintiff as the statutory liquidator of the Bank."

Plaintiff in his argument in support of this proposition proceeds on the assumption, first, that the bank was *instructed* by Metropolitan to remit all payments due to it on its notes and mortgages whether collection of such payments due to it had or had not in fact been made by the Bank, and, second, that the agreement provided that remittances so made were not to be credited upon or treated as payments of the *mortgage obligations* until the Bank advised Metropolitan so to do.

It is my opinion that the record does not bear out either of these assumptions. There is nothing in the record to support a contention that the Metropolitan Insurance Company ever *instructed* the Bank to make advancements.

Under the terms and conditions of the contract as modified by the correspondence the Bank had three methods of procedure in event of the inability of a mortgagor to make an installment payment upon his obligation when the same became due. The Bank might request the Insurance Company to waive one or more installment

payments if it chose to do so. If it did not desire to pursue this course, it might itself make a repurchase or exchange of the mortgage that had been assigned to Metropolitan. If it did not desire to do either of these things, then it might itself advance the installment to Metropolitan on behalf of the mortgagor and charge the mortgagor therefor. I presume that there might be included therein a fourth avenue of operation upon the part of the Bank in the event of a default of a mortgagor. It might fail to exercise any one of the three options enumerated in the contract and thus throw upon Metropolitan the duty of bringing foreclosure proceedings against the mortgagor. In this event, however, the Bank might endanger its contract with Metropolitan, which it considered valuable, or it might, in addition, impair its market for the sale of mortgage loans.

The fact is that at the time the original agreement was made in 1920 and up and until the year of 1931 mortgagors were seldom found to be defaulting in payments of interest and principal installments on their obligations. Apparently neither of the parties to this agreement and the subsequent modifications thereof contemplated or visioned any extensive defaults upon the part of mortgagors whose mortgage obligations had been assigned without recourse to Metropolitan. Very few defaults occurred during that entire period of time. On January 21, 1926, in a letter from the Bank to Metropolitan (Stip. 1, Par. 6) the Bank made the following statement: "According to our records as of Dec. 31st, 1925, we have 74 loans totaling $247,057.00. This amount, you will note, does not correspond with your records for the reason that in several cases, we have advanced payment from this office, in order to keep your records current where we have felt justified in so doing because of the honesty and integrity of the mortgagor and because of reasons beyond our control."

The above appears to be the first indication in the record that the Bank had chosen to make some advancements out of its own funds on behalf of the mortgagors "because of the honesty and integrity of the mortgagor and because of reasons beyond our control." This appears to be the first notification that Metropolitan had that the Bank had made any such advances. On May 12, 1931, the Bank addressed another letter to Metropolitan in which it stated in part the following: "We have in the past, chosen

not to bother you with requests for waivers, but the accumulation of these advances over a period of five or more years, has now reached the total of something over $150,000.00."

To this letter Metropolitan replied under date of May 14, 1931, expressing surprise that the defaults of mortgagors and the advancements of the Bank because of defaults had reached such proportions, and Metropolitan asked the Bank to render it a statement or a list of such advances.

This appears to me to have constituted an invitation to the Bank to enter into a discussion that might be helpful in solving the problem that confronted it, but the record does not disclose any reply upon the part of the Bank to this inquiry of Metropolitan and it does not disclose that any list of advances was ever forwarded to Metropolitan.

That these defaults and consequent optional advancements upon the part of the Bank did not become serious until as late as May of 1931 and did not become a problem to the Bank until after the beginning of the year 1931 is borne out by the record. In the letter from Metropolitan to Bank heretofore cited, dated May 14, 1931, Metropolitan states: "He advised me, as I remember, that there were certain borrowers who were able to keep their interest and taxes up, but who were unable to pay any principal installments, and that the advances, while not serious, did not seem wise if there was any method of postponement."

In the transcript of the record, page 52, I find in the cross-examination of Mr. Shoemaker the following question and answer:

"Q. Mr. Shoemaker, a large volume of advances were made by the bank to Metropolitan after December 2, 1930. Is that correct?  A.  Yes, sir."

In the correspondence growing out of the inquiry of the Superintendent of Banks on this question of making advancements, it appears that at that time, in December of 1930, the advances were not so large as to constitute a serious problem. It is common knowledge that after the blow of the stock market collapse in October of 1929 there came a reaction and another pickup in business that extended through the year 1930. It was about the close of that year and the beginning of 1931 that business slowed at a rapid rate, men lost their employment and consequent defaults in obligations became numerous. However, it was probably from May to August of 1931, when this Bank closed its doors and during which period other banks were collapsing, that the greater number of advances now complained of by the Bank was made by the Bank. The Bank had the door opened to it by Metropolitan in May of 1931 to submit a list of its advancements to Metropolitan. Apparently it did not do so and it engaged in no further discussions of record with Metropolitan, but continued to make advancements in preference to asking for waivers, repurchasing mortgages, or throwing upon Metropolitan the burden of taking such steps, including foreclosure, as it might deem advisable.

The record does not bear out plaintiff's contention that Metropolitan *instructed* the Bank to make advancements to it of defaulted installments, but rather bears out a contrary conclusion that the Bank *elected*, in some instances, to make advancements in preference to asking Metropolitan for waivers and in preference to repurchasing mortgages, and that these advances were made without the knowledge of Metropolitan until substantially in May of 1931.

I find that the record does not sustain plaintiff in his second contention that the agreement expressly provides that none of the remittances made by the Bank were to be credited upon or treated as payments *upon the mortgage obligations* until Metropolitan was notified by the Bank so to do.

In the exchange of letters between the two parties as well as in the correspondence involved in the inquiry of the Superintendent of Banks, I find frequent references to "crediting upon the notes" and "endorsing upon the notes," but nowhere do I find any statement to support the plaintiff's contention that the remittances were not to be credited upon or treated as payments upon the mortgage *obligation*. The very manner in which the Bank kept its card records of each mortgage and the manner in which the balances were made to coincide in the remittance statements made weekly by the Bank to Metropolitan with Metropolitan's monthly billings therefor, indicates that the Bank was treating these advancements as payments to Metropolitan made by the Bank for and in behalf of the mortgagors.

If the advancements were to be treated as such and were to remain the property of the Bank until notification by the Bank to Metropolitan that it may credit certain pay-

ments to the mortgage obligations, then the record is strangely silent as to any obligation of Metropolitan to maintain these accumulated advancements in a segregated fund for and in behalf of the Bank. Nowhere in the record do I find any discussion whatever on the question of interest accruals or earnings on these advance payments, and in the question of earnings on these payments I would think that the Bank would be keenly interested if it deemed these advancements to be truly its own property. Nowhere in the record do I find any evidence of daily, weekly, monthly, or even annual statements passing between the Bank and Metropolitan in order to disclose and reconcile, one with the other, the balance in any segregated fund or the earnings of interest upon such a segregated fund. If these advancements were to be treated as property of the Bank, certainly during a period of time that transpired from 1920 to 1931 there would have been some attempt upon the part of the Bank to express an interest in the sum total of advances that it had made to Metropolitan and that it claimed as its own.

A close examination of the whole record and especially of the correspondence that passed between these parties convinces me, first, that these advances were not made upon the instruction of Metropolitan to the Bank, and, second, that these advances were made by the Bank to Metropolitan as payments upon the mortgage obligations.

The correspondence discloses to me that the reason that impelled the Bank to request of Metropolitan that it do not credit upon the mortgage notes any advances made by the Bank, was that the Bank did not desire to become embarrassed by having the mortgagor know that his note in the hands of Metropolitan had received a credit for a payment by the Bank in his behalf, and further, the Bank did not desire to be compromised or embarrassed in any way if it chose to repurchase the mortgage and begin foreclosure proceedings.

Plaintiff's second general proposition is: "The relationship between Metropolitan and the Bank at all times was that of principal and agent, and even though the agreement between them did not expressly require Metropolitan to reimburse the Bank for advances made to Metropolitan or made for Metropolitan's benefit within the scope of the agency relationship, such obligation of the principal to reimburse the agent arose by legal implication."

The disclosures in the record do not permit me to agree with this position. Plaintiff assumes that advances made by the Bank to Metropolitan were made for Metropolitan's benefit. Nowhere in the record do I find Metropolitan requesting or demanding that a benefit be bestowed upon it by its agent. The only reference in the record that I find from Metropolitan to the Bank that lead up to the weekly payment by the Bank of installments when due, is the statement by Metropolitan that the New York insurance department would not permit a continuance of the plan, whereby the Bank made a monthly remittance to Metropolitan and thereby withheld from Metropolitan the privilege of earnings upon the collections made during the thirty days preceding the remittance. It appears to be the contention of the plaintiff that because the Bank changed to a system of weekly payments to Metropolitan and remitted payments that were due, that it did so solely for the benefit of Metropolitan. Metropolitan was engaged in purchasing mortgages from the Bank. The Bank was engaged in selling mortgages to Metropolitan. Apparently Metropolitan was not in need of money and because of the sales passing between the parties the Bank was receiving money from Metropolitan in exchange for the assignment of these mortgage obligations. Metropolitan did desire some method of accounting whereby it would not be criticized by the State Insurance Department for a monthly loss of interest on installments paid, that would amount to a considerable sum of money in the course of a year, in view of the large volume of mortgages that Metropolitan had purchased from the Bank. As I have heretofore pointed out, the Bank had certain options and certain choices whereby it might handle cases of default, and if it chose, for reasons pertinent to itself, to volunteer payments to Metropolitan when due but uncollected, then it appears to me that it was making such remittances, not for the benefit of Metropolitan, but for its own benefit as well as for the benefit of the mortgage obligors.

■■ The Bank apparently endeavored to maintain an unimpaired market for the sale of its mortgages. It may be that it desired to avoid the necessity of repurchasing mortgages that were in default. It may be that it did not desire to disclose to Metropolitan that a number of defaults were occurring by asking waivers of Metropol-

itan. It had what it deemed a valuable contract with Metropolitan that paid to it large sums of money each year for its services. The servicing of these mortgages permitted it to contact a large number of individuals who became patrons of the Bank. By occasionally advancing a payment for a mortgagor who was temporarily embarrassed financially, it ingratiated itself with the mortgagor and perhaps secured business thereby. Numerous reasons might be called to mind that may have impelled the Bank for its own good reasons, for its own benefit, for the benefit of its mortgagors, to have elected to make these advancements to Metropolitan. The authorities support the theory that where an agent makes voluntary advancements to its principal for the benefit of a third person, the agent is not entitled to reimbursement from his principal; and if he makes remittances to his principal for his own benefit and becomes a volunteer there can be no recovery. In the case of Coffey v. Lawman, 6 Cir., 99 F.(2d) 245, at page 246, paragraph 9 of the syllabus reads as follows: "Where national bank, which was trustee of mortgage pool, paid interest on mortgages to holders of participation certificates in the pool in advance of collection from mortgagors and without obligation to do so, bank was a volunteer in making such interest payments, so that, in certificate holders' action to recover for maladministration of trust, bank's receiver was not entitled to set-off for the interest payments."

█ It is my opinion that the plaintiff does not sustain his second proposition.

Plaintiff's third proposition is as follows: "Disregarding the agency relationship it must be borne in mind that the Bank was a quasi public corporation, the business of which and the interests of whose depositors were regulated by law. If the Bank made to Metropolitan requested remittances in the form of advances upon mortgages owned by Metropolitan, which the Bank was not legally obligated to make, such payments were ultra vires and unlawful and can be recovered back by the Superintendent of Banks for the benefit of his trust."

I find no claim upon the part of plaintiff of the violation of any statute of the State of Ohio.

During the period of time covered by these mortgage transactions, the Bank was authorized under the provisions of Sec. 710–47 of the General Code of Ohio to carry on as follows: "To do all needful acts, to carry into effect the objects for which it was created."

It is not claimed by plaintiff that the Bank was without authority to make mortgage loans and to dispose of the same.

It is claimed by plaintiff that in December of 1930 the Superintendent of Banks, O. C. Gray, sent to the Bank a form letter in which he called attention to the practice of some banks of servicing mortgage loans which they had sold and of remitting the total amount of principal and interest on the due date, even though collections had not been made in full at that time, thereby creating an overdrawn condition of the account. Stip. 1, Par. 22.

It appears, however, that, following a visit to the Superintendent of Banks by two of the officers of the Bank and after these officers had rendered to the Superintendent an explanation of the manner in which they conducted their business with Metropolitan, the Superintendent was satisfied with the Bank's relationship with Metropolitan and never thereafter questioned the legality of this relationship. It seems from the record that the Superintendent of Banks was interested in that part of the agreement between the parties that required remittances received from the Bank not to be endorsed *on the notes* except upon the written advice of the Bank. When he became satisfied that no endorsements were actually made by Metropolitan upon the notes when they received remittances from the Bank, he appeared to be satisfied.

The Superintendent of Banks at no time raised the question of fraud or of deceit involving the relationship of the Bank with his department and these elements are not asserted by the plaintiff.

Following the visit of the officers of the Bank to the Superintendent of Banks, the examiners of the Superintendent had access to the books and papers of the Bank and to the history of all of its financial transactions from December of 1930 to August 17, 1931, when the Bank closed its doors. At no time during this period of time, and it seems to have been from about the first of the year 1931 until the close of the Bank that most of these advances were made, does it appear that the bank examiners raised any question pertaining to the legality of the methods pursued in servicing these mortgage loans.

As I have heretofore pointed out, the Bank had its option to repurchase mortgage

loans that it had sold to Metropolitan on which there had been a default in the payment of installments either of principal or of interest. In many instances it did so repurchase mortgage loans. When it did so it secured back a loan guaranteed and secured by a mortgage upon the real estate of the mortgagor. When advancements were made to Metropolitan, the Bank had followed a strict custom of immediately charging to the mortgagor the amount of the advancement, and on this advancement the Bank charged the mortgagor six per cent interest.

This whole policy, while it ended unfortunately with substantial advancements having been made by the Bank to Metropolitan, was in my opinion neither contrary to public policy nor prohibited by any statute of the state.

"Whether a contract with a bank is lawful or ultra vires is dependent on whether its aims are within the scope of proper banking objects and whether its performance is within the powers expressly or impliedly conferred or prohibited.

"A contract of a bank is legal if it is not expressly prohibited, and if it has a natural and reasonable tendency to aid in the accomplishment of the objects for which the bank was created." Corpus Juris Secundum, Banks and Banking, vol. 9, p. 343, § 160.

The object of the Bank in entering into the kind of contract which obtained between it and Metropolitan was to aid in the accomplishment of one of the objects for which the Bank was created.

The Bank was authorized under the statute to do all needful acts necessary to carry into effect the objects for which it was created and, in pursuance of its chosen field of engaging in the making and selling upon a wholesale basis of mortgage loans, it entered into this contract in furtherance of that business.

I have heretofore enumerated some of the benefits which the Bank received through the operation of this contract, in addition to the surplus interest above 5½ per cent per annum which it reaped on these loans. These interest receipts of the Bank were in themselves substantial and were deemed by the Bank to be of great benefit to it and hence desirable. The method followed of making advancements on behalf of certain mortgagors, most of whom were patrons of the Bank, was deemed of benefit to its patrons by the Bank and hence greatly beneficial to the Bank itself. The plaintiff presses this claim on the erroneous assumption that Metropolitan requested, insisted and perhaps forced the Bank to make remittances in the form of advancements. The record does not bear this out but does indicate quite plainly that the Bank chose to make certain advances rather than to exercise other options that were available to it in the event of a default by a mortgagor.

I am not convinced that the action of the Bank was against public policy, was in violation of any statute, and was an ultra vires act, illegal and beyond the power of the Bank to entertain.

The question of fraud and deceit not being involved, I am not convinced that the Superintendent of Banks as the liquidator of the affairs of the Bank is possessed of any greater powers than the Bank itself possessed.

The petition of the plaintiff is dismissed at his costs. Defendant, Metropolitan Life Insurance Company, may have ten days in which to prepare and file findings of fact and conclusions of law drawn in accordance with this opinion. Plaintiff may have ten days thereafter to file his exceptions to the same and his suggestions of any additions thereto.

The attention of counsel is called to objections of plaintiff to the admission in evidence of parts or portions of paragraphs 31, 32, 36, 37, 43, 45 and 46 in Stipulation No. 1 and the objection of defendant to the admission of the letter dated December 8, 1930, found in paragraph 24 of Stipulation No. 1. The objections have heretofore been sustained by the Court. Exceptions are saved to each party.